DECISION AND JUDGMENT ENTRY
{¶ 1} This appeal comes to us from a judgment issued by the Lucas County Court of Common Pleas, Domestic Relations Division, granting a divorce to the parties and determining property division issues. Because we conclude that the trial court erred in its determinations concerning the division of marital debt and marital funds, we reverse in part and affirm in part.
 {¶ 2} Appellant, Bobbie J. Ladman, and appellee, Bruce F. Ladman, were married in May 1984; no children were born as issue of the marriage. In August 2003, appellee filed a complaint for divorce. Appellant first filed an answer and a motion to dismiss the complaint, but later, filed an amended answer and counterclaims, also seeking a divorce.
 {¶ 3} After conducting a final hearing on disputed issues, including property division and spousal support, the court issued the following factual findings. Appellant joined the U.S. Army in 1984, and was stationed in Nebraska for three years, working as an operating room technician. She was transferred to Georgia in 1987, and then to San Antonio, Texas in 1992. While on active duty from 1984 to 1998, appellant was the primary wage earner. During this time, appellee attended college full-time, completing both a bachelor's and master's degree in education. Although appellee served in the Army Reserve from 1981 to 2000, and occasionally worked part-time, appellee's income contribution to the marriage before 2000, was minimal.
 {¶ 4} In 1998, appellant was placed on temporary disability as a result of chronic medical problems and received compensation equal to one-half of her salary. In 2001, appellant took an early retirement from the Army due to her medical disabilities. At the time of trial appellant, who was nearly 53, continued to be in fair to poor health, diagnosed with the following debilitating medical and mental health conditions: fibromyalgia, avascular necrosis of bilateral femoral heads, C6-7 disc herniation, left shoulder impingement, lumbar disc disease with spinal stenosis, mitral valve prolapse, chronic fatigue syndrome, depression, post traumatic stress disorder from child abuse, stress incontinence, pseudogcut, bilateral patellofemoral syndrome, duodenal ulcers history, Raynaud's syndrome, chronic sinusitis, and a medial and later meniscal tear of the right knee. Her conditions have required several spine surgeries since retirement. She obtained an EMT, paramedic, and other related licenses while in the service, but was unable to maintain these due to her medical conditions.
 {¶ 5} At the time of trial, she was unable to work, was taking various pain and other medications, and needed complete cervical neck fusion surgery. Although she had attended the University of Toledo, her medical conditions prevented her from finishing some classes. As a result, she still needed one to two semesters to complete her bachelor's degree. Appellant desired to complete her bachelor's degree and a master's degree in bioethics, eventually working part-time as her medical conditions permit.
 {¶ 6} Appellee, 44 years old at the time of trial, was in good health, and was assigned to Active Guard Reserve in 2000. He was an Army instructor at the University of Toledo until 2004, when he was transferred to Georgia where he was currently an Army Captain and logistic officer at Fort Mcpherson. In July 2003, appellee moved out of the marital home in Toledo. In August 2004, after appellee's transfer to Georgia, appellant moved back to San Antonio, to the parties' previous marital home. Appellee incurred approximately $2,200 in moving expenses, which will be mostly reimbursed by the Army. Appellant incurred $4,684 in moving expenses to move household furnishings, pets, and her vehicle to Texas.
 {¶ 7} Appellant's monthly income at the time of trial totaled $2,548, consisting of appellee's assigned $1,024 BAH pay, $814 from temporary spousal support, and $710 net from her military retirement check. Appellant's proposed monthly budget was $3,725, excluding medical or dental insurance or taxes on spousal support. The court found appellee's net monthly income to be $3,000, after paying taxes, spousal support, and a $392,401K contribution.
 {¶ 8} For purposes of marital property division, "during the marriage" dated from May 9, 1984 through the day of trial, October 21, 2004. The parties stipulated to the value of the marital residence at $97,000, with a mortgage balance of $25,142. The $71,858 equity was split equally between the parties, calculated at $36,929 to each. Appellant was awarded the marital home, with the condition that she refinance the mortgage within six months and pay appellee his portion of the equity. Appellee's military pension will be divided equally between the parties by a QDRO.
 {¶ 9} The parties were awarded their own vehicles and the household belongings each possessed at that time, with appellant to return to appellee his father's .22 rifle. The court also awarded appellant $3,500 to balance out the marital funds allocated to various pension, investment, and bank accounts, which are listed as follows:
 {¶ 10}
Husband Wife
IRAs $16,951.00 $17,005.00401K (husband) $8,577 4,288.50 4,288.50Randolph Brooks Credit Union
Husband Checking $8,503 4,251.50 4,251.50 Husband Savings 380 190.00 190.00 Joint Account 5.00 Wife's Account 16.00 Husband Account #2 (at separation) 10,000.00 3,000.00Metlife Insurance Policy (husband) Cash value unknown — divided equallyIRS Tax Refund (parties' agreement) 131.00
 {¶ 11} At the time of separation, the parties' credit card balances were $2,111 on the MBNA credit card and $224 on the Randolph Brooks MasterCard. At the time of the final hearing, the MBNA had increased to $5,831 and the Randolph Brooks MasterCard increased to $4,646. In addition, appellant had charged $4,484 to a Bank of America VISA for moving expenses, $100 on a Kohl's credit card, and $100 on a Target credit card. Appellee was ordered to pay one-half of the balances at the time of separation. Any increases in the balances or additional accounts were ordered to be appellant's separate responsibility.
 {¶ 12} Appellee was ordered to pay appellant $2,000 per month in spousal support, to terminate upon either party's death or appellant's remarriage. The court also ordered appellant to be responsible for her health insurance and expenses, and the parties to pay their own attorney fees and costs.
 {¶ 13} Appellant now appeals from that judgment, arguing the following four assignments of error:
 {¶ 14} "I. The trial court's order of spousal support to wife was against the manifest weight of the evidence.
 {¶ 15} "II. The trial Court abused it's [sic] discretion in failing to provide an order of health insurance for wife.
 {¶ 16} "III. The trial court abused it's [sic] discretion by failing to take into account husband's depletion of marital funds.
 {¶ 17} "IV. The trial court abused it's [sic] discretion in allocating marital debt more to wife, when husband has a substantially greater income than wife."
 {¶ 18} We will address appellant's assignments of error out of order.
 I. {¶ 19} In her second assignment of error, appellant argues that the trial court abused its discretion in failing to order appellee to pay the monthly cost of medical insurance.
 {¶ 20} A trial court is authorized and has the discretion to order a spouse to continue to provide health insurance coverage to the other spouse after the divorce. Henninger v. Henninger
(May 4, 1993), 2d Dist. No. 1303; Goode v. Goode (1991),70 Ohio App.3d 125, 131. However, Ohio law does not mandate such an award as part of spousal support. Id.
 {¶ 21} In this case, appellant testified that within 18 months after the divorce, appellant would qualify to receive medical treatment and medications through the Veterans Administration. Consequently, appellant's need for other medical insurance coverage would have been for that finite 18 month period. The record is unclear, however, as to whether appellant actually qualified for any insurance plan or the cost of such coverage. After several discussions at trial, the record indicates that appellant could not be covered through COBRA and that the cost for a military insurance plan called TRICARE insurance was $310 per quarter. Ultimately, however, appellant asserted that she also did not qualify for the TRICARE plan. No other proposed insurance plan or costs were presented.
 {¶ 22} We agree that, when appellant's ill health and limited financial resources are contrasted with appellee's good health, higher income, and earning potential, equity favors appellee's contribution to the cost of appellant's health care for the 18 month interim period. Nevertheless, since appellant failed to present evidence of an actual plan and its cost under which she could receive coverage, we cannot say that the trial court abused its discretion in ordering appellant to be responsible for her own medical insurance. The trial court noted, however, that this issue, as a form of spousal support, could be revisited, should appellant find coverage under a health insurance plan.
 {¶ 23} Accordingly, appellant's second assignment of error is not well-taken.
 II. {¶ 24} In her third assignment of error, appellant claims that the trial court erred in failing to consider appellee's alleged depletion of marital funds. Appellant is essentially arguing that the evidence shows that marital funds existed which were unaccounted for by the trial court. We agree.
 {¶ 25} Marital property is generally presumed to include all property acquired during the marriage. Dudich v. Dudich, 8th Dist. No. 84742, 2005-Ohio-889, at ¶ 31. A party seeking to have property declared nonmarital has the burden of proof to rebut this presumption. Id. A trial court's classification of property as marital is reviewed under the standard of manifest weight of the evidence. Marcum v. Marcum (1996), 116 Ohio App.3d 606,612.
 {¶ 26} We initially note that any error or confusion in the trial court's factual findings concerning the parties' bank accounts and transfers of funds is completely understandable. While reviewing the record in this case, we observed an astonishing lack of evidentiary documentation of the various bank accounts to explain or trace funds which were transferred by appellee. In addition, appellee's testimony was often convoluted and confusing regarding the origin of funds in an account or where the funds were transferred. Most of the accounts with substantial funds were solely in appellee's name. Although appellee submitted a typed "summary" of his alleged transfers, he offered no actual bank statements to substantiate these transfers or the exact balance in the accounts at the time of the separation. Presumably, since the accounts were recent or still open, such statements were easily obtained. Since no such documentation was offered, however, this court may only consider and review the testimony and evidence as submitted to determine whether the record supports the trial court's findings.
 {¶ 27} Appellee first testified that the Randall Brooks "2166" account contained $12,000 of marital funds when he moved out. He stated that, "upon advice of counsel," he took "half of it" (presumably $6,000), gave appellant $3,000, and then took another $3,000 for "safe-keeping" and "never touched it." The current location of this last $3,000 was never clearly revealed. According to appellee's undocumented "summary" of transactions, he transferred an additional $5,630 from the "2166" account to appellant's account for various additional expenses between August 21, 2003 and September 29, 2003, comprised of: $3,000 for appellant's attorney fee retainer; $2,000 for support (two $1,000 payments); $430 for a house payment; and $200 for "maintenance" (two $100 payments). He also testified that he repaid $3,500 in personal loans to his mother and sister, without indicating the source of the funds. Curiously, these amounts added together total $18,130 — $6,130 more than the original balance claimed by appellee to be in the Randolph Brooks "2166" account. This excess amount of funds suggests that the parties either had more money in the "2166" account to begin with or funds utilized were from an undisclosed source. Appellee's testimony regarding his multiple transfers and re-transfers between accounts suggests an intent to camouflage either marital funds or non-marital expenditures from those funds. Again, bank statements with a synopsis showing all transactions and fund destinations might have dispelled such a suggestion.
 {¶ 28} Appellee's "summary" also listed a $1,500 transfer on August 9, 2003, to the parties' Fifth Third Bank joint account from his Huntington Bank account, opened sometime after his move to Georgia. The record is silent as to the current status of the Fifth Third Bank account. Appellee acknowledged that in April 2004, his Huntington account had a balance of $10,123, but provided no documentation to show where this money came from. At the time of trial, the balance in the Huntington account had decreased to $5,048. Appellee stated that he used the missing $5,000 for moving and living expenses, including rent. Since nothing was offered by appellee to show that any of this money came from some separate, outside source, the remaining funds in that account are marital. After reviewing the testimony and sparse documentation, the following is our determination and distribution of the funds which, at some point during the marriage, existed in the Huntington, Randolph Brooks, or other accounts. Since the amounts expended total more than what was represented as existing in accounts at the time of separation, the record demonstrates that funds remained unaccounted for by the trial court. Therefore, the trial court's determinations and distribution of marital funds were against the manifest weight of the evidence.
 {¶ 29} We note that the absence of documentation may have been due in part to the trial court's reluctance to permit the parties to testify with more detail and particularity. Nonetheless, both parties would have benefited from the offering of composite exhibits to assist the trial court or for purposes of appeal. As a result, our calculations as listed below, are necessarily based primarily upon appellee's testimony regarding the amounts distributed to or expended during the pendency of the divorce, rather than the balances originally alleged to be in the accounts.
 {¶ 30}
Husband Wife
Randolph Brooks "2166" $ 6,000 $ 3,000 "Safe-keeping" transfer 3,000 Transfer for attorney retainer 3,000 Transfer to 5/3 Bank Support 1,000 Support 1,000 Repaid loans (mother sister) 3,500 Living expenses 5,000 House payment 430 "Maintenance" (two $100 payments) 200 _______ _______ TOTALS $19,500 $ 6,630
 {¶ 31} The $2,000 in support payments must be credited to appellee as a support payment, not a "property" distribution. Since we have already credited appellee with the $5,000 in living expenses, the remaining $5, 048 balance is marital and should be divided equally between the parties. The $1,500 allegedly transferred to the joint account will be credited to neither party, since no documentation of its purpose or confirmation number was presented, even on appellee's own "summary." We leave undisturbed the equal distribution of the cash value of appellee's life insurance policy. Based upon these new calculations, the division of the parties' cash funds are modified as follows:
 {¶ 32}
Husband Wife
IRAs $16,951.00 $17,005.00401K (husband) ($8,577) 4,288.50 4,288.50Randolph Brook Credit Union
Husband Checking ($8,503) 4,251.50 4,251.50 Husband Savings ($380) 190.00 190.00 Joint Account 5.00 Wife's Account 16.00Marital Funds (Distributed) 19,500.00 6,630.00Huntington Account ($5, 048) 2,524.00 2,524.00IRS Tax Refund (parties' agreement) 131.00 __________ __________ Subtotals $47,710.00 $35,036.00 — 6,337.00 + 6,337.00 __________ __________ TOTALS (cash only) $41,373.00 $41,373.00
 {¶ 33} By our calculations, to equalize the cash portion of the marital property, instead of $3,500, appellee should have been ordered to pay $6,337 to appellant.
 {¶ 34} Accordingly, appellant's third assignment of error is well-taken.
 III. {¶ 35} In her fourth assignment of error, appellant contends that the trial court erred in allocating more of the marital debt to appellant, when appellee has greater income and earning ability.
 {¶ 36} In divorce proceedings, the trial court must determine what constitutes marital property and what is separate property. R.C. 3105.171(B). Marital property includes all interests the parties obtain "during the marriage," including medical expenses. Id. The phrase "during the marriage" generally refers to the period from the date of the marriage until the date of the final hearing in an action for divorce. Id.
 {¶ 37} In this case, the trial court utilized the usual period from the date of the marriage until the final hearing date as its designated "during the marriage" time period. Therefore, any medical bills during that time which were not covered by the parties' insurance were marital debt, especially under the circumstances where one spouse is unemployed or retired due to medical disability. Although appellee contends that he had transferred some money to appellant during August and September 2003, appellant alleged that she still had to use credit cards for some of her medical bills. Our review of the record reveals that appellant's counsel attempted to present evidence of the types of charges made on the credit cards after appellee moved from the marital home, but the court did not recognize the need for reviewing or presenting such information with particularity. Consequently, appellant was not permitted to testify as to the specific amounts for medical charges on the statements. In our view, any charges which would have been marital, such as medical bills or other marital expenses, should have been considered as marital debt and, at minimum, divided equally between the parties.
 {¶ 38} Therefore, the trial court erred in ordering appellant to pay the extra credit card charges incurred after the date of separation, without first determining the amount of any medical charges or other marital expenses, and dividing such costs between the parties.
 {¶ 39} Accordingly, appellant's fourth assignment of error is well-taken.
 IV. {¶ 40} In her first assignment of error, appellant argues that the trial court's spousal support amount awarded was against the manifest weight of the evidence.
 {¶ 41} An award of spousal support is generally a determination within the sound discretion of the trial court.Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 218; Bowen v.Bowen (1999), 132 Ohio App.3d 616, 626. Absent an abuse of that discretion, a reviewing court may not substitute its judgment for that of the trial court. Holcomb v. Holcomb (1989),44 Ohio St.3d 128, 131. An abuse of discretion is more than an error of law or judgment; it implies that the trial court's attitude in reaching its judgment was unreasonable, arbitrary or unconscionable. Blakemore, supra, at 219.
 {¶ 42} Nevertheless, a trial court's broad discretion in awarding spousal support is controlled by R.C. 3105.18(C)(1).Carmony v. Carmony, 6th Dist. No. L-02-1354, 2004-Ohio-1035, at ¶ 10. When considering whether to award spousal support, a court should consider all fourteen factors listed in R.C. § 3105.18(C) to determine an amount which is appropriate and reasonable, not an amount based only upon need. Schultz v. Schultz (1996),110 Ohio App.3d 715, 724. "While the concept of need is necessarily encompassed in an inquiry upon appropriateness and reasonableness, it is no longer the sole consideration." Kennedyv. Kennedy, 7th Dist. No. 03 CO 37, 2004-Ohio-6798, at ¶ 14, citing to Olenik v. Olenik (Sept. 18, 1998), 7th Dist. No. 94 CA 139. The trial court is not required to comment on each factor, but need only indicate that the court considered each factor in making its spousal support award. Tallman v. Tallman,
6th Dist. No. F-03-008, 2004-Ohio-895, at ¶ 58; Stockman v.Stockman (Dec. 15, 2000), 6th Dist. No. L-00-1053.
 {¶ 43} R.C. 3105.18(C)(1) provides:
 {¶ 44} "(C)(1) In determining whether spousal support is appropriate and reasonable, and in determining the nature, amount, and terms of payment, and duration of spousal support, which is payable either in gross or in installments, the court shall consider all of the following factors:
 {¶ 45} "(a) The income of the parties, from all sources, including, but not limited to, income derived from property divided, disbursed, or distributed under section 3105.171 of the Revised Code;
 {¶ 46} "(b) The relative earning abilities of the parties;
 {¶ 47} "(c) The ages and the physical, mental, and emotional conditions of the parties;
 {¶ 48} "(d) The retirement benefits of the parties;
 {¶ 49} "(e) The duration of the marriage;
 {¶ 50} "(f) The extent to which it would be inappropriate for a party, because that party will be custodian of a minor child of the marriage, to seek employment outside the home;
 {¶ 51} "(g) The standard of living of the parties established during the marriage;
 {¶ 52} "(h) The relative extent of education of the parties;
 {¶ 53} "(i) The relative assets and liabilities of the parties, including but not limited to any court ordered payments by the parties;
 {¶ 54} "(j) The contribution of each party to the education, training, or earning ability of the other party, including, but not limited to, any party's contribution to the acquisition of a professional degree of the other party;
 {¶ 55} "(k) The time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment, provided the education, training, or job experience, and employment is, in fact, sought;
 {¶ 56} "(l) The tax consequences, for each party, of an award of spousal support;
 {¶ 57} "(m) The lost income production capacity of either party that resulted from that party's marital responsibilities;
 {¶ 58} "(n) Any other factor that the court expressly finds to be relevant and equitable."
 {¶ 59} In this case, appellant was awarded $2,000 per month in spousal support, to continue until appellant's remarriage or either party's death. Appellant also receives disability income of $710.81 per month, bringing her total monthly taxable income to $2,710.81. After subtracting spousal support, appellee's gross monthly income, including wages, BAS, and BAH, is $4,110.83, leaving appellee with a difference of $1,400 more in gross income than appellee.
 {¶ 60} Although we recognize that appellant's need in this case is great because of her medical conditions, the award of spousal support may not be based solely on that consideration. As we noted previously, if appellant was able to secure health insurance, she may be able to request additional assistance from appellant to pay for the cost. In addition, in light of our determinations of appellant's third and fourth assignments of error, her financial burdens may be somewhat lessened. Unfortunately, appellant faces a common consequence of divorce, i.e., that financing two separate households on the same income requires the parties to adjust their spending habits and standards of living, especially when one spouse has medical issues. Therefore, we cannot say that, under the circumstances, the trial court abused its discretion in the amount of spousal support awarded.
 {¶ 61} Accordingly, appellant's first assignment of error is not well-taken.
 {¶ 62} The judgment of the Lucas County Court of Common Pleas, Domestic Relations Division, is affirmed in part and reversed in part, and remanded for proceedings consistent with this decision. Appellant and appellee are each ordered to pay one-half of the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Lucas County.
Judgment affirmed, in part, and reversed, in part.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Handwork, J., Skow, J., Parish, J., concur.